UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BRENT N. TORTOLANO,<br><br>                    Plaintiff,<br><br>v.<br><br>WILLIAM POULSON, JOHN AND<br>JANE DOES<br><br>                    Defendants. | Case No. 1:13-cv-00438-EJL<br><br><br>**MEMORANDUM DECISION AND<br>ORDER** |

Pending before the Court in this prisoner civil rights case is Defendant William
Poulson's Motion for Summary Judgment. (Dkt. 35).  Also pending is Plaintiff Brent
Tortolano's Second Motion to Take Judicial Notice. (Dkt. 43). The Court finds that the
parties have adequately presented the facts and legal arguments in the briefs and record
and that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Having carefully
reviewed the record, and otherwise being fully informed, the Court enters the following
Order.

## BACKGROUND

This is a prisoner civil rights claim involving claims for violations of 42 U.S.C. §
1983 and the Eighth Amendment to the United States Constitution. Plaintiff Brent
Tortolano is an inmate in the custody of the Idaho Department of Corrections at the Idaho
State Correctional Institution in Kuna, Idaho. He alleges that the Defendant, William
Poulson, a certified nurse practitioner at ISCI, was deliberately indifferent to his serious

medical needs. Essentially, Tortolano's claims involve challenges to the medical care he received for ongoing pain in his shoulder and lower back. His most consistent allegation has been that beginning in about August of 2013, Poulson refused to renew his prescription for the drug Ultram. The facts most critical to an understanding of the issues are as follows.

Tortolano, who was approximately 30 years old at the time of the events giving rise to this lawsuit, was seen frequently by ISCI medical providers for pain in his shoulder and back throughout 2012 and 2013. He was prescribed a variety of medications for these conditions, including Norco, Vicodin, Ultram, Baclofen, Mobic, and Effexor. Norco and Vicodin are well-known narcotics used to treat pain. Ultram, also known as Tramadol, is a centrally acting synthetic opioid analgesic that has been described as having a weaker opiate effect than drugs such as Vicodin and Norco, though it still potentially addictive.[1]  (Poulson Aff. Dkt. 35-3). Baclofen is muscle relaxant used to treat muscle strains and sprains and Mobic is a non-steroidal anti-inflammatory treatment. (Poulson Aff., Dkt. 35-3 at ¶ 5). Effexor is an antidepressant also used to treat pain. (*Id.* at ¶ 14).

According to the medical records, Plaintiff first began complaining of pain in his right shoulder some time in 2011. (*Id.* at 4; Medical Records, Dkt. 35-4 at 41 & 83.). He began complaining of back pain in January of 2012, after his legs went out from under

---

[1]  As noted by the Court in a prior order, both the Mayo Clinic and the online Physician's Desk Reference classify Tramadol as an "opioid analgesic" or a "centrally acting opioid analgesic." *See http://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050. See also, http://www.pdr.net/drug-summary/ultram?druglabelid=950.*

him and he was unable to get up due to severe lower back pain. He was taken to the prison infirmary after that incident, where he showed no swelling or bruising, but was tender to the touch on his lower spine. A prison medical provider assessed a muscle strain/sprain and concluded that a skeletal injury was unlikely, and prescribed Baclofen , Vicodin, and Mobic. (*Id.*). The next day, Tortolano returned to the infirmary no less than three times, complaining of pain that rated as a seven on a scale of one to ten. Though he appeared to be in no acute distress, the nurse he saw that day believed he might be suffering from something more than muscle strain. (*Id.*). An X-ray taken on January 16, 2012, however, found no spinal abnormalities except a slight narrowing of the disk space between the L5-S1 vertebrae. (*Id.* at 18).

Over the next several months, Tortolano was seen in the infirmary on several occasions for ongoing shoulder and back pain. A physician first orderd Ultram on January 18, 2012. (*Id.* at 40). The following month the dosage was increased from twice a day to three times a day. (*Id.* at 39). The medical records from March through October of 2012 show that various providers, including Poulson, were consistently prescribing Ultram during this period. (Poulson Aff., Dkt. 35-3, at ¶¶ 10-18). They also show that Tortolano received physical therapy, which he reported helped with the pain in his lower back, but not with his shoulder. (*Id.* at ¶ 14; Medical Records at 377.)

On October 30, 2012, Tortolano underwent surgery on his right shoulder to repair an AC joint separation.[2] This surgery did not completely resolve his shoulder pain and so

---

[2] The "AC" joint refers to the acromioclavicular joint in the shoulder.

for several months afterwards, Tortolano was prescribed a variety of medications to address the pain, including Effexor, Ultram, and on occasion, Norco. (Poulson Aff. ¶¶ 19-24).

On March 19, 2013, Tortolano underwent a second surgery on his right shoulder (Medical Records, Dkt. 35-5, at 195-196). In a follow up appointment several days later, he reported that his pain was well controlled. (Dkt. 35-3 at 61). During the next two-and-a-half months, Tortolano was prescribed Effexor, Mobic, Ultram, and also Norco, during the fourteen days immediately following surgery. (Poulson Aff., Dkt. 35-3 ¶¶ 25-27).

Tortolano's most extensive, and for this case, significant, encounters with Defendant Poulson began in June of 2013. On June 13, 2013, Tortolano visited the ISCI clinic and was seen by Poulson, who noted that the patient wished to address his lower back pain, which at that point he rated as far greater than his shoulder pain. However, Poulson noted that the patient's claims of physical distress were not consistent with his appearance, physical exam, good range of motion, and the x-rays on file. In the notes for this visit, Poulson stated his impression that the patient was seeking opioids for his functional, non-specific lower back pain. Concerned that the risk for addiction at this point was greater than the analgesic benefits of Ultram, especially given Tortolano's history of substance abuse and bi-polar disorder, Poulson recommended that he be tapered off the drug. (Poulson Aff. ¶ 29; Dkt. 35-3 at 54). Poulson also recommended that Tortolano be enrolled in the persistent pain clinic, which was implemented to more closely evaluate the medications of patients with persistent pain. (*Id.* at ¶ 26). Over the next two months, Tortolano continued to receive Ultram consistently, though the dose

MEMORANDUM DECISION AND ORDER                                                    4

varied depending on the provider he saw. (Poulson Aff. ¶¶ 32-34). He also submitted a number of Health Services Requests ("HSRs" or "kites"), which generally asserted that he was not getting adequate pain relief for his back. (Dkt. 35-5 at 243, 250-556).

On August 27, 2013, Tortolano presented to the ISCI clinic again, indicating that his shoulder pain had mostly resolved but that the pain in his back was severe and that he needed more Ultram. He was seen this time by Poulson. Poulson noted that Tortolano had no difficult ambulating, and also noted that the physical examinations and x-ray evidence on file suggested a slight degenerative disc narrowing in the lower bakc, but that no objective medical evidence explained his subjective complaints of pain. Poulson described Tortolano as "confrontational" when non-narcotic treatments were suggested and reiterated the concerns about substance abuse. At that point, Poulson decided to taper Tortolano off Ultram slowly, out of a concern that he might develop worse withdrawal symptoms than a typical user would. Poulson further noted that the Ultram had been prescribed to assist Tortolano through the pain occasioned by his shoulder injury and related surgeries, not for back pain. (Poulson Aff. ¶ 35; Dkt. 35-3 at 24, 47, & 60).

On September 3, 2013 Tortolano saw a provider by the name of Scott Schaffer. (*Id.* at 59-60). Schaffer's impression of Tortolano was that despite the complaints of severe lower back pain, he appeared to have no difficulty in his daily activities, had good muscle tone, a stable gait, and appeared very athletic. Schaffer offered Tortolano the drug Pamelor to treat sciatica, but Tortolano declined. Schaffer, like Poulson, believed that Tortolano was not a candidate for continued opioid use due to his history of substance abuse. He contacted Mr. Poulson to discuss this assessment, and Mr. Poulson agreed.

MEMORANDUM DECISION AND ORDER                                          5

Also on this day, an ISCI nurse observed Tortolano playing basketball and noted it in the medical records. (*Id.*).

On September 8, 2013, Tortolano submitted another HSR, specifically complaining that Poulson had discontinued his Ultram, and reporting pain, inability to sleep, and restricted mobility. (Dkt. 35-5 at 250). On September 11, 2013 he returned to the pain clinic, and was apparently so disruptive that the provider who saw him was unable to perform a physical exam. (Dkt. 35-4 at 58). Tortolano filed another HSR the next day. (Dkt. 35-6 at 245).

On September 15, Plaintiff arrived at the medical clinic after an unobserved fall from his bunk. Poulson was on duty at that time. (Dkt. 35-4 at 58). The parties have somewhat differing interpretations of what happened that day. Tortolano, on the one hand, claims that after he had already waited over an hour in extreme pain and distress, he asked Poulson if he could be seen soon and Poulson stated "you can wait another hour, because I said so." (Dkt. 3 at ¶ 88-90). Poulson, on the other hand, asserts that the wait time was due to the fact that emergency services were being provided on another patient. He also asserts that despite claiming that he had a "lump" in his back, Tortolano would not allow himself to be fully examined. Poulson also noted exaggerated pain behaviors. He diagnosed non-traumatic back pain, prescribed two 5 mg Norco tablets, and a bottom bunk for one week (*Id.* at 24, 58).

On September 19, 2013, Tortolano saw Dr. Murray Young, the Regional Medical Director for Corizon Medical Services. At this point, Tortolano's Ultram had run out. Tortolano told Dr. Young that pain was preventing him from engaging in most of his

MEMORANDUM DECISION AND ORDER                                    6

normal activities. However, Dr. Young noted that Tortolano was very athletic and in no apparent distress. He prescribed ice massages and Prednisone, a steroid, for five days. He also indicated that he would refer Tortolano to a neurosurgeon if his back pain continued. Though Tortolano received no more Ultram after September 11, 2013, he was still taking Effexor and Mobic, as well as Robaxin, a muscle relaxant, and Prednisone at various points during September 2013. (Dkt. 35-4 at 89, 91).

On October 7, Dr. Young ordered another x-ray of Tortolano's lumbar spine. The results revealed no acute significant abnormalities other than the slight narrowing of the lumbo-sacral disc, which had been observed in the January 2012 images. (*Id.* at 15, 21 & 46). Tortolano saw Dr. Young again on October 17, 2013, and was noted to be angry and combative. Other than pain on palpation over the L4-L5 area, the physical exam was normal, and he did not appear to be in any discomfort. At that point, Dr. Young decided to refer Tortolano to a neurosurgeon. (*Id.* at 45).

On November 12, 2013 Tortolano saw Poulson again. Again, Polson described Tortolano as appearing normal and ambulating briskly but becoming combative once his medication situation was discussed. Mr. Poulson's note from this visit also expressed his belief that the patient was "provider shopping," as indicated by repeated visits to the clinic. The notes also indicate that at that point, Poulson had decided to defer the patient's pain management to Dr. Young. (*Id.* at 43-44).

Plaintiff saw a neurosurgeon, Dr. Paul Montalbano, on January 15, 2014.  He also had an MRI done that day. (Dkt. 35-6 at 379). In explaining the MRI results, Dr. Montalbano noted that there was no evidence of significant canal/foraminal stenosis and

MEMORANDUM DECISION AND ORDER                                                    7

recommended an additional set of flexion/extension x-rays of the lower spine. (378). Dr. Montalbano described these images as "normal," and as showing no evidence of instability or degenerative changes. (381). Dr. Montalbano concluded, "I would recommend no further treatment/workup to address his subjective complaints, which are not supported by his radiographic studies. His symptomology is consistent with high function overlay." (*Id.*). As far as the Court can tell, the term "functional overlay" means simply that Dr. Montalbano believed there was a significant emotional component to Plaintiff's symptoms.

Tortolano filed his lawsuit on October 8, 2013 seeking monetary damages and injunctive relief. (Dkt. 3). The Court allowed him to proceed with a claim for deliberate indifference against Poulson, (IRO, Dkt. 9), but ultimately denied the request for a preliminary injunction. (Dkt. 27). The motion for summary judgment followed.

## LEGAL STANDARDS

### 1. Summary Judgment Standards.

Summary judgment is appropriate where a party can show that, as to a particular claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to

MEMORANDUM DECISION AND ORDER                                    8

trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Rather, there must be no *genuine* dispute as to any *material* fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Finally, material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

**2. Standards for Deliberate Indifference Claims**

This Court has set forth the standard for deliberate indifference claims in several Orders previously filed in this case. The Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

Regarding the objective standard for prisoners' medical care claims, the Supreme Court of the United States has explained that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain . . . .

MEMORANDUM DECISION AND ORDER                                    10

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

As to the subjective standard, a prison official or prison medical provider acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe, Nev.,* 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837).

In the medical context, a conclusion that a defendant acted with deliberate indifference requires that the plaintiff show both "a purposeful act or failure to respond to a prisoner's pain or possible medical need and . . . harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted).

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a

MEMORANDUM DECISION AND ORDER                                            11

deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). This is because the Eighth Amendment does not provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her.").

## DISCUSSION

### 1. Deliberate Indifference

The Court has conducted a careful review of the medical record, as well as the briefs and affidavits submitted by the parties, and finds Plaintiff's claims to be without merit. Tortolano's arguments amount to a restatement of the proposition alleged in his complaint, namely, that he continuously complained of pain due to his lower back injury, and Defendant did nothing to ease his pain and suffering. (Plaintiff's Brief, Dkt. 44 at p. 8-9). However, bare assertions and allegations unsupported by specific facts in the record do not suffice to defeat a motion for summary judgment. Moreover, the rule that all facts must be viewed in the light most favorable to the non-moving party does not require the Court to accept obvious fictions in resolving a motion for summary judgment. *See, Scott v. Harris,* 550 U.S. 372, 380 (2007) (holding that when opposing parties tell two different

stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts in ruling on a motion for summary judgment."). Here, the medical evidence establishes that far from allowing Tortolano to live with unresolved pain, he was actually given two shoulder surgeries, physical therapy, and a variety of medications to relieve the pain in his shoulder and lower back. He also underwent three separate imaging studies in the space of two years to determine what was going on in his lower back, and was sent to see a neurosurgeon. He was never without pain medication of some kind at any point during the relevant time period. While Poulson ultimately determined that the Ultram had to be discontinued, he did this only after Tortolano's shoulder pain had resolved, when he developed concerns that Tortolano was in danger of becoming addicted to Ultram. Poulson was merely the first of several providers who became concerned that Tortolano was developing symptoms of addiction and who saw the necessity of tapering him off Ultram. The wisdom of Poulson's conclusion was ultimately borne out not only by Dr. Young, but by the outside neurosurgeon, Montalbano, who concluded that there was significant functional overlay component to Tortolano's subjective complaints of lower back pain.

The facts of this case fall squarely within the well-settled law that an inmate does not have a claim for deliberate indifference simply because he or she disagrees with her provider about the appropriate course of treatment. This Court has recently had occasion to observe how this general rule plays out where a prison medical decides to deny an inmate narcotic pain relief:

Whether to prescribe narcotic medication to inmates is a decision that is within the discretion of medical professionals, especially regarding whether prescribing the medication would create or sustain a suspected addiction to narcotics. Whether to treat inmates with narcotic medication, which is potentially addictive, is a topic of ongoing debate among medical professionals, and, thus, it is an area that particularly falls within the reasonable exercise of a professional medical opinion.

*Dill v. Correctional Medical Services,* 2013 WL 1314007 at * 5 (D. Idaho 2013)

(internal citations and quotations omitted).

It is true that the *Dill* case also held that "[i]f a jail or prison has a blanket policy prohibiting all narcotic medication under all circumstances, and the inmate can show a causal link between the policy and the inmate's injury, that circumstance can amount to deliberate indifference." The Affidavit of Keith Brown contains some vague allegations alluding to a policy that was in place during the 2012 to 2014 time frame whereby ISCI medical care providers disallowed the use of narcotic pain relief from all inmates on the compound and replaced them with psychotropic drugs. (Brown Aff., Dkt. 44-7 at ¶ 7-11; Verified Complaint ). Tortolano's Affidavit also states that he believes Corizon Medical Services told its nurse practitioners not to allow pain medications. (Dkt. 44-1 at ¶17). However, it is not clear how the existence of a company-wide policy would have anything to do with the issues in this case, which involves claims against Poulson, and not a suit against a governmental or corporate entity under *Monell v. Department of Social Services,* 436 U.S. 658 (1978). Customs and policies are relevant to claims of municipal or entity liability, not to claims against individuals in their individual capacity. *Rubtsov v. Los Angeles County Dept. of Children & Fam. Svcs.* 2015 WL 2227801 (C.D. Cal. 2015).

MEMORANDUM DECISION AND ORDER                                          14

Mr. Brown's affidavit also points to certain comments made by Poulson and/or Dr. Young regarding the use of pain medications at the prison during a case monitoring meeting in *Balla v. State of Idaho,* 1:81-cv-01165.[3] Brown alleges that during one of these meetings Poulson stated that, "all inmates come into my office to test me; to see if I will give them pain pills for fake ailments." This statement was offered, presumably, to show that Poulson has hardened attitude toward inmates who complain of pain, thus supporting an inference that he acted with deliberate indifference towards Tortolano's serious medical needs. However, even if the Court makes this inference on Tortolano's behalf, he would still have to show that Poulson's decision to deny medication was medically unacceptable *in his particular case. Toguchi v. Chung*. 391 F.3d at 1058. Here, all the evidence in the record points to the opposite conclusion—i.e., that far from constituting deliberate indifference, Poulson's decision to discontinue Ultram showed significant insight and wisdom. At any rate, there is nothing in the record—other than speculation and innuendo—that would suggest otherwise. Conclusory or self-serving affidavits and arguments, "lacking detailed facts and any supporting evidence [are] insufficient to create a genuine issue of material fact." *FTC v. Publishing Clearing House, Inc.,* 104 F.3d 1168, 1171 (9th Cir. 1997).[4]

---

[3] *Balla* is a class action lawsuit challenging the constitutionality of living conditions at ISCI, including the adequacy of medical care.

[4] The Court will not consider other statements described in Mr. Brown's affidavit that have not been specifically attributed to Poulson.

MEMORANDUM DECISION AND ORDER                    15

Nor do events surrounding Tortolano's visit to the ISCI clinic on September 15, 2013 serve to create a genuine issue of material fact. Again, Tortolano asserts that Poulson made him wait for over an hour-and-a-half, and then told him "now you can wait another hour, because I said so." (Dkt. 3 at ¶ 88-90). Poulson for his part notes that the wait time was due to emergency services in progress, and that Tortolano was uncooperative and would not submit to a full examination, despite claiming to have a lump in his back. Though the parties' versions of events differ somewhat, this need not detain the Court long because the undisputed facts in the record show that Tortolano did eventually receive treatment that day and that Poulson actually prescribed Norco for two days and a bottom bunk for a week. Further, no actual back injury was ever identified, not on September 15, 2013, or by any provider thereafter. Thus, Poulson's actions during this clinic visit do not amount to deliberate indifference.

Tortolano also has raised objections to the fact that he continued to be seen by Poulson even after this lawsuit was filed. That type of argument, however, would seem to fit more under the framework of a *Monell* policy and practice claim, which this case does not involve. Though it is not necessary to address the issue today, the Court notes in passing that it would pose some serious practical problems for prison administrators if an inmate could eliminate a practitioner from the roster of possible medical providers simply by filing a lawsuit. In any event, Tortolano has not established that any of the care he received from Poulson, either before or after the lawsuit was filed, amounted to deliberate indifference.

MEMORANDUM DECISION AND ORDER                                          16

Because the Court concludes that Poulson's treatment of Tortolano did not amount to deliberate indifference, it declines to address Defendant's other argument, namely that back pain that cannot be accounted for by objective medical evidence does not constitute a serious medical need.

### 2.  Additional Issues (Injunction and Motion for Judicial Notice)

In a previous Order denying Plaintiff's request for a preliminary injunction, the Court instructed the parties that going forward, they should address "not only the past medical care Plaintiff has received for potential liability and damage purposes, but also  . . . the more recent and ongoing medical care, that goes to his injunctive relief request." (Order, Dkt. 27 at 9). Though Tortolano asserts that he still suffers from pain and is not getting adequate treatment (Dkt. 43 & 44 at 13), he has offered no evidence to support this assertion. Moreover, the parties focused their summary judgment submissions primarily on past rather than current care. The only actual evidence in the record on more recent care is found in Poulson's Affidavit, which briefly describes the medical care that Plaintiff received from January of 2014 (when Dr. Montalbano concluded that his back pain did not require any further treatment) up to the date the summary judgment motion was filed in December of 2014. (Poulson Aff., Dkt. 35-3 at ¶¶ 51- 60). This evidence shows that throughout 2014, Tortolano made occasional visits to the medical unit, and also that on more than one occasion, he refused treatment for back pain and other conditions. (*Id.*). Further, on September 23, 2014, he signed a "release of responsibility" saying that he wanted out of chronic care and wanted "nothing to do with medical." (Dkt. 35-6 at 444). Briefly put, nothing in the record suggest that there were problems with

Tortolano's ongoing medical care (at least up to through December 14, 2014), that would warrant the entry of an injunction. However, nothing in this order should preclude Tortolano from requesting injunctive relief regarding medical care he received after that date.

Finally, the Court will deny Plaintiff's Second Motion for Judicial Notice (Dkt. 43). This motion asks the Court to take judicial notice of no less than eight other deliberate indifference cases that have been filed in recent years. The Court previously explained that it would not take judicial notice of the content of an entire case in a wholesale fashion (Dkt. 41 at 11). However, Tortolano has not identified which documents from these cases he believes are relevant. Thus, the motion will be denied.

## ORDER

1.  Defendant's Motion for Summary Judgment (Dkt. 35) is **GRANTED**.

2.  Plaintiff's Second Motion to Take Judicial Notice (Dkt. 43) is **DENIED.**

DATED: August 3, 2015

Edward J. Lodge
United States District Judge